Jason D. Curry, Esq. (#026511)
Anthony F. Pusateri, Esq. (#036206
QUARLES & BRADY LLP
2 North Central Avenue, #3
Phoenix, Arizona 85004
Telephone: (602) 229-5200
Email: jason.curry@quarles.com

Jonathan Monaghan, Esq. (admitted *pro hac vice*)
HOLLAND & KNIGHT LLP
10 St. James Avenue, 11th Floor
Boston, MA 02116
Telephone: (617) 573-5834
Email: john.monaghan@hklaw.com

Anthony F. Pirraglia, Esq. (admitted *pro hac vice*)
HOLLAND & KNIGHT LLP
787 Seventh Avenue, 31st Floor
New York, NY 10019
Telephone: (212) 513-3887
Email: Anthony.Pirraglia@hklaw.com

*Attorneys for Arena Investors, LP, as Collateral Agent and Administrative Agent for Arena Investors, LP and Walleye Opportunities Master Fund Ltd.*

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | In Proceedings Under Chapter 11 |
| GRESHAM WORLDWIDE, INC., | Case No. 2:24-bk-06732-SHG |
| Debtor. | **ARENA INVESTORS, LP'S EMERGENCY MOTION TO APPOINT CHAPTER 11 TRUSTEE** |
| | **Expedited Hearing Requested** |

Arena Investors, LP ("Arena"), in its capacity as collateral agent and administrative agent on behalf of secured noteholders Arena Investors, LP and Walleye Opportunities Master Fund Ltd. ("Walleye"; Arena and Walleye are each a "Noteholder" and together, the "Noteholders"), files this Motion to Appoint Chapter 11 Trustee (the "Motion").[1] In support of the Motion, Arena respectfully states:

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed in the *Omnibus Objection and Reservation of Rights to Debtor's Emergency Motions for Entry of (I) Interim and Final Orders Approving Cash Collateral; (II) Interim and Final Orders to Obtain Secured Postpetition Financing With Superpriority Over Administrative Expenses; And (III) Order*

# PRELIMINARY STATEMENT

Arena has raised serious concerns regarding the ability of the Debtor's board and management to engage in good faith as a fiduciary for the Debtor and its estate. Those concerns were exacerbated by the Debtor's longstanding (and continuing) refusal to provide meaningful information regarding its organizational structure, operations, cash flows and non-Debtor subsidiaries. Now, incredibly, documents and information obtained over the past 48 hours reveal an egregious disregard of fiduciary duties. When combined with a continuing pattern of misrepresentations and misconduct that may rise to fraud on the Court, there is only one conclusion: the Debtor must be dispossessed and all pending motions must be held in abeyance to minimize risk of further damage to the estate through the continuing conduct of the Debtor's management, its board and Milton "Todd" Ault III, the executive chairman and principal of the controlling shareholder, the second lien lender, and the proposed DIP lender, Ault Alliance Inc. and Ault Lending LLC. The Court must enter an order authorizing the appointment of a chapter 11 trustee, precluding the Debtor, Ault and their respective executives from acting on behalf of, or with respect to, the Debtor or any of its subsidiaries. The situation is so egregious that it warrants the Court's immediate attention. *See In re Bibo*, 76 F. 3d 256, 258 (9th Cir. 1996) ("Appellant argues that a bankruptcy court lacks authority to appoint a trustee in a Chapter 11 proceeding sua sponte. We disagree.").

---

*Authorizing Payment of Prepetition Wages and Benefits to Employees* [Dkt. No. 36] (the "Omnibus Objection") or the supplement thereto [Dkt. No. 91] (the "Supplemental Objection," and together with the Omnibus Objection, the "Objection")

On Monday, September 9 at 5 p.m. (Arizona time), Arena met its court ordered deadline to file the Supplemental Objection based on limited discovery alleging that the Debtor's pattern of obfuscation, pervasive conflicts of interest, questionable management and accounting practices, and multitudinous misrepresentations regarding an insider DIP facility demonstrated a chapter 11 strategy designed to protect Ault to the detriment of the Debtor, creditors and the estate.[2] One hour after the pleading hit the docket, the Debtor served a supplemental production comprised of one document – 37 pages of hand written notes from the personal journal of the Debtor's CFO, Mr. Lutz Henckels (the "Henckels Notes").  The document is a compilation of dated memoranda ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ An explanation of certain of the notes, ████████

████████████████████████████, is set forth below, and a copy of the Henckels Notes are attached as **Exhibit A**.

Eight days before the bankruptcy filing, ██████████████████████

████████████████████████████████████████████████████████

[2] The Debtor refused to produce responsive documents – or even take a position with respect to its failure to do so - prior to the deadline, such that Arena is entitled to supplement the Supplemental Objection or request a further extension of time. All rights reserved.





As more fully discussed in the Objection, Mr. Horne worked to design a DIP facility that appeared to be, and was in fact intended, ███████████████████████ ████████████████████████████████████████████ ████████████████████████████████ Yet, the Debtor filed a motion misrepresenting the DIP facility as the result of good faith and arm's length negotiations involving Mr. Read. The proposed DIP would not only have ensured that Ault retained its ownership of the Debtor but also that no party in interest could investigate or pursue any

claims of any kind against Ault Lending. Arena objected arguing, *inter alia*, the entire fairness standard would apply to any insider DIP facility. As a result, on August 22, the Court declined to approve the DIP Motion and urged the Debtor to embrace the transparency required of a debtor-in-possession.





1

2

3    Similarly, the Debtor stated "[o]n or about August 27, 2024, Mr. Read spoke with

4

5    Bob Stevenson and Jesse Pickel at Roth Capital regarding potential DIP financing."

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 ██████████████████████████████████████████

2 ████████████████████████.

3

4 ████████████████████████████████████

5

6

7

8

9

10

11

12

13

14 ████████████████████████████████████

15

16    The tone and tenor of these conversations take on a far more alarming meaning

17 given CEO Jonathan Read's spiteful attacks on Arena, its employees ████████

18 ████████. As the Court may recall, Arena attempted to inspect the Debtor's books and

19 records as contemplated under its security agreement earlier this year.  After two court

20 orders, the Debtor required Arena to appear in person, where CEO Read harassed and

21 personally attacked various employees for their appearance and employ.  Most concerning,

22 however, is the continuing behavior and testimony of CEO Read. ████████████

23

24 ████████████████████████████████████████████

25

26 ████████████████████████████████████

27 ██████████████████

28



[13] Arena's counsel has a beard.

1    Mr. Read's testimony was alarming for other reasons, whether truthful or not. █

2    ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████ A

14   copy of the Dep. Tr. of J. Read Dated Sept. 9, 2024 is attached as **Exhibit B**.



This fundamental refusal, or inability, to provide basic information regarding the Debtor is simply unacceptable, and what little information the Debtor has provided crystallizes why the Debtor fought so hard to avoid providing Arena any level of transparency: the Debtor and its subsidiaries are in financial disarray and the Debtor

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

## JURISDICTION

1.     The United States Bankruptcy Court for the District of Arizona (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue of this motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein is section 1104 of the title 11 of the United States Code (the "<u>Bankruptcy Code</u>") as complemented by the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## PROCEDURAL BACKGROUND

4.     On August 14, 2024 (the "<u>Petition Date</u>"), Gresham Worldwide, Inc. ("<u>Gresham</u>" or the "<u>Debtor</u>") filed its voluntary petition [Dkt. No. 1] with this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "<u>Bankruptcy Code</u>"), thereby commencing the above-captioned bankruptcy proceeding (the "<u>Case</u>").

---

█

████████████████████████████████████████          ██████████████

5.    On August 19, 2024, the Debtor filed its (i) *Emergency Motion for Entry of Interim and Final Orders Approving Use of Cash Collateral* [Dkt. No. 14] (the "Cash Collateral Motion"), (ii) *Emergency Motion for Entry of Interim and Final Orders (i) Authorizing Debtor to Obtain Secured Postpetition Financing with Superpriority Over Administrative Expenses and (ii) Granting Related Relief* [Dkt. No. 16] (the "DIP Motion"), and (iii) *Emergency Motion for Entry of Order Authorizing Payment of Prepetition Wages and Benefits to Employees* [Dkt. No. 17] (the "Wage Motion," and together with the Cash Collateral Motion and the DIP Motion, the "First Day Motions").

6.    On August 21, 2024, Arena filed the Omnibus Objection to the First Day Motions, which is fully incorporated herein by reference.

7.    On August 27, 2024, Arena served the Debtor with the *First Set of Interrogatories to Debtor* (the "Interrogatories") and the *First Request for the Production of Documents to Debtor* (the "RFPs").

8.    On August 28, 2024, the Debtor filed its Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs [Dkt. No. 54] ("SOFA").

9.    On September 4, 2024, the United States Trustee filed its *Appointment of Official Committee of Unsecured Creditors* [Dkt. No. 71], appointing Prospect Properties and Roth Capital Partners LLC as members of the committee (the "Committee").  The Committee subsequently selected Stinson LLP as its counsel, which filed an application seeking court approval of its retention on September 9, 2024 [Dkt. No. 84].  Additionally, the Debtor provided its responses to the Interrogatories (the "Interrogatory Responses") and produced certain documents responsive to the RFPs (the "Document Production"). The Debtor did not produce any current financial statements or information relating to its

Subsidiaries, ███████████████████████████████████████████

███████████████████████

10.     On September 9, 2024, Arena filed the Supplement, which is fully incorporated herein by reference.

11.     On September 11, 2024, (i) the Debtor filed the (a) *Supplemental Declaration of Jonathan R. Read in Support of Debtor's Cash Collateral and DIP Financing Motions* [Dkt. No. 100] (the "Read Supplement") (b) *Declaration of Lutz Henckels in Support of Debtor's Cash Collateral and DIP Financing Motions* [Dkt. No. 101] and the (c) *Reply in Support of Debtor's Motions (i) for Entry of Interim and Final Orders Approving Use of Cash Collateral; and (ii) to Approve DIP Financing* [Dkt. No. 106] the "Debtor Reply") and (ii) Ault filed the *Response to Arena Investor LP's Supplement to Its Omnibus Objection to the DIP Motion* [Dkt. No. 102].

## FACTUAL BACKGROUND[21]

12.     On January 9, 2023, the Noteholders and Gresham entered into that certain Securities and Purchase Agreement (the "Purchase Agreement") pursuant to which Gresham issued $3,333,333.34 Senior Secured Convertible Notes (the "Original Convertible Notes") for a $3,000,000 purchase price.   Contemporaneously with the Purchase Agreement, the Noteholders and Gresham entered into that certain Security Agreement (the "Security Agreement"), by which the Debtor's obligations under the Purchase Agreement were secured by substantially all of the Debtor's assets (the

---

[21] Arena requests that the Court take notice of and integrate by reference the fact and argument set forth in the Objection to the extent not restated herein.

"Collateral").   In addition, the Investors received 1,666,666 warrant shares ("Initial Warrants").

13.    On January 10, 2023, Ault Alliance, Inc. ("Ault Alliance") executed that certain Subordination Agreement (the "Subordination Agreement") in favor of the Noteholders, subordinating its secured convertible notes to the Convertible Notes held by the Noteholders.

14.    On October 11, 2023, the Original Convertible Notes were exchanged for new Senior Secured Convertible Notes ("Exchange Notes"). The aggregate principal amount of the Exchange Notes increased to $4,000,000, the interest rate increased from 6.0% to 7.0%, the maturity date was extended to April 11, 2024, and a working capital covenant was included.  Gresham's working capital was required to increase by a minimum of $250,000 per quarter for the quarters ending December 31, 2023 and March 31, 2024 and by $500,000 per quarter thereafter, excluding (i) any debt owed to Ault Alliance or any of its affiliates and (ii) the Exchange Notes.

15.    In connection with the Exchange Notes, the 1,666,666 Initial Warrants were reissued, and an additional 666,666 warrants ("Additional Warrants") were issued to the Noteholders.

16.    On April 11, 2024, the Exchange Notes matured and became immediately due.  Gresham did not make, and has not made, any payment.  Gresham publicly admitted and confirmed a default on April 15, 2024 in its 10-K Annual Report. *See* GIGA Form 10-K, dated April 15, 2024 at F-20 ("As of December 31, 2023 the Convertible Notes are in default.").

17.     On April 26, 2024, Arena delivered to Gresham a formal letter of default detailing certain defaults, including (i) Gresham's failure to repay in full the indebtedness under the Exchange Notes on the Maturity Date; (ii) Gresham's failure to satisfy the minimum quarterly working capital increase covenant as of December 31, 2023; and (iii) Gresham's failure to notify the Noteholders of the occurrence of the foregoing defaults within one (1) business day of their occurrence, as required under the terms of the Exchange Notes.

18.     As stated above, on April 15, 2024, Gresham filed with the SEC its Form 10-K for year-end 2023 which, among other things, (i) acknowledged that Exchange Notes were in default as of December 31, 2023, (ii) included going concern qualifications, (iii) disclosed that Ault Alliance controlled the board of directors and appointed four board members, including three who are also directors of Ault Alliance, (iv) disclosed that Ault Alliance provides human resources, accounting, and other services to Gresham, and (v) recognized various accounting failures. *See generally* GIGA Form 10-K dated April 15, 2024.[22]

19.     On May 1, 2024, Arena proposed a forbearance agreement by which Gresham would have a runway of six (6) additional months (which could be extended) to

complete a SPAC transaction that was being negotiated with an affiliate of Ault Alliance – Ault Disruptive Technologies Corporation – a company for which William Horne serves as CEO, and Milton Ault III, William Horne, Henry Nisser, Jeffrey Bentz and Robert Smith serve as officers and/or directors. *See* Ault Disruptive Tech. Corp. Form 10-K, dated April 11, 2024 at 56. On May 14, 2024, Arena followed up on the forbearance proposal.

20. On May 30, 2024, Gresham requested more time to respond to the forbearance terms.

21. On May 31, 2024, Arena and Walleye executed that certain Collateral Agency and Intercreditor Agreement in connection with the Convertible Notes, establishing Arena as collateral agent.

22. On June 6, 2024, Arena sent a Supplemental Notice of Default to Gresham. That same day, Arena received Gresham's response to the forbearance terms.

23. On June 13, 2024, Arena made a counterproposal to Gresham's proposed forbearance terms.

24. On June 19, 2024, Gresham, through its counsel, rejected Arena's counterproposal without offering a further counterproposal.

25. On June 20, 2024, Arena stated that it was willing to be paid in kind for default interest provided that Gresham and Arena could reach an agreement on the remaining balance of the forbearance agreement. No response was received.

26. On June 6, 2024—approximately six months after Gresham's initial default and two months after Gresham's payment default—Arena filed a complaint against Gresham and Ault Alliance in the Supreme Court of the State of New York, County of New York (the "State Court"), Index Number 652898/2024 (as subsequently amended on

July 8, 2024, the "Complaint") based upon Gresham's defaults in connection with the Exchange Notes and Ault Alliance's breaches under the Subordination Agreement.

27.   On June 28, 2024, Arena delivered to Gresham its preliminary request list for a books and records inspection.  On July 8, 2024, Arena delivered a second request for customer-supplier agreements.

28.   On July 3, 2024, after several delays by Gresham, outside counsel for Arena and Gresham attempted to schedule the books and records inspection.  No progress was made, and Arena gave Gresham until July 8, 2024 to make its books and records available through a data room. Gresham did not make any books and records available to Arena in any manner.

29.   On July 9, 2024, Arena sought injunctive relief from the State Court requiring a books and records inspection.  Arena had timely delivered the inspection notice, proposed five (5) different dates for a call to discuss the inspection, provided a list of records it intended to review, and even offered to have a third party advisor review any highly confidential records.

30.   At a hearing on July 12, 2024, the State Court granted Arena's motion, stating that it was "surprised that there is opposition to this motion," and ordered an inspection to begin no later than July 17, 2024.  *See* Tr. of July 12, 2024 Hr'g at p. 3.

31.   On July 13 and 14, 2024, Gresham sought to impose unreasonable conditions on the books and records inspection, including by requiring Arena to travel to California for the inspection and refusing to set up a data room or provide documents in electronic format even if the subject documents are maintained in electronic format in the ordinary course of Gresham's business.  Arena again sought relief from the State Court.

32. On July 15, 2024, the State Court ordered Gresham to set up a data room, or another professional means, for Arena and its advisors to conduct the inspection. *See* July 15 State Court Order ("If Gresham's records are maintained electronically, either a data room shall be set up or another professional means shall be arranged for plaintiff to inspect the records electronically").

33. On July 17 and 18, 2024, a books and records inspection was conducted at Gresham's headquarters in Livermore, California. During and after the inspection Gresham's CEO, Jonathan Read ("<u>CEO Read</u>"), interfered and harassed Arena's inspection team, including by hurling insults and insisting that there was "nothing in the court order that prevents profanity. Nothing that prevents name calling either." Among other things, CEO Read called members of Arena's inspection team "scum," "filth," and "motherf****r[s]".

34. The harassment did not end when the inspection did. CEO Read sent harassing and threatening messages to Arena employees by email and over LinkedIn. Copies of these messages are attached as **<u>Exhibit C</u>**.

35. On July 30, 2024, Arena's counsel sent a letter to Gresham's counsel requesting that Gresham investigate CEO Read's harassing and insulting behavior (including targeted attacks and offensive communications with Arena personnel through email and LinkedIn).

[REDACTED]

37.     On August 1, 2024, CEO Read filed a sworn declaration in the State Court proceeding asserting that on July 17 and 18 inspection dates, Gresham was not in the "zone of insolvency." *See Affirmation of Jonathan R. Read* (the "Read Affirmation") at ¶¶ 87-88 (stating that "during the Inspection, Arena requested very targeted items, which, upon information and belief, Arena intends to use to demonstrate that Gresham is in a purported 'zone of insolvency.' However, and for the reasons set forth above, ___nothing could be further from the truth___.") (emphasis added).  On or about the same day, Gresham agreed to retain Debtor's counsel as bankruptcy counsel and to pay a $200,000 retainer, which Debtor's counsel disclosed was funded primarily by Ault Lending. *See Verified Statement of Patrick A. Clisham in Support of Debtor's Application for Order Authorizing Employment of Engelman Berger, PC as Counsel for the Debtor* [Dkt. No. 11] (the "Verified Statement") at ¶ 4.

38.     On August 2, 2024, Gresham initiated a $75,000 wire transfer to Debtor's counsel to partially fund the retainer. *Id*. at 5.

40.     On August 9, 2024, (i) Debtor's counsel was paid $75,000 with Ault Lending's money to partially fund the retainer (*see* Verified Statement at ¶ 4); and (ii)

41.     On August 12, 2024, Arena exercised its contractual right to tender the resignation letter of CEO Read, removing him as the Debtor's CEO and as a director of the Debtor's board.  *See* GIGA Form 8-K dated Aug. 16, 2024.



1

2

3

4

5

6

7

8

9

10

11

12                                   (ii) the Debtor used a portion of these funds to pay Debtor's counsel

13 the remaining portion of its retainer (*see* Verified Statement at ¶ 4),

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[23] Debtor's Form 10-K, dated April 15, 2024 at p. 44 ("Messrs. William J. Thompson and Thomas E. Vickers are considered to be independent, and the remaining directors are considered not to be independent. . . .").

44.     On August 19, 2024, the Debtor filed the DIP Motion, seeking approval of a financing facility with Ault Lending pursuant to a DIP agreement, signed by William Horne and CEO Read, which would have barred the Debtor, on a *de facto* basis, from pursuing any cause of action against Ault Lending regardless of whether such action related to the DIP Facility.  *See* Ex. B to DIP Motion (the "DIP Agreement") at § 4.14. ████

████████████████████████████████████████████████████

████████████████████████████████

45.  ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

46.     On August 27, 2024, the Court entered the *Interim Order Granting Debtor's Motion for Authority to Use Cash Collateral* [Dkt. No. 51] (the "Interim Cash Collateral Order").  The budget attached to the Interim Cash Collateral Order removed a "New Purchases" line item that was included in the form of budget filed with the DIP Motion because the Debtor had no intention to use those funds for such purchases and preferred to

████████████████████████████████

strike that line-item entirely rather than break-out the expenses to show the intended use of the funds.[25]

47.    On September 4, 2024, the Debtor provided its *Responses and Objections to Arena Investors, LP's (1) First Set of Interrogatories to Debtor and (2) First Set of Requests for the Production of Documents to Debtor* (the "Discovery Response").  The Debtor refused to produce, among other things, organizational documents of the Debtor's subsidiaries, monthly financial statements or projections from the Debtor's subsidiaries, bank account statements from the Debtor's subsidiaries, or customer contracts from the Debtor's subsidiaries.

48.    Additional factual background relevant to the Motion is set forth in the Objection, which is fully incorporated herein.

## RELIEF REQUESTED

By this Motion, Arena seeks entry of an order substantially in the form attached as **Exhibit D** appointing a chapter 11 trustee pursuant to sections 1104(a)(1) and (2) of the Bankruptcy Code to manage the Debtor's business and affairs.

## BASIS FOR RELIEF REQUESTED

The presumption that a debtor should remain in possession of its estate and in control of its affairs holds only if management "can be depended upon to carry out the fiduciary responsibilities of a trustee." *Commodity Futures Trading Com v. Weintraub*, 471

---

[25] Upon information and belief, the "New Purchases" line item was for, among other things, (i) travel expenses, (ii) janitorial expenses, (iii) copier leases, and (iv) other miscellaneous expenses.  Notwithstanding, the Debtor did not correct the Court when it became clear the Court thought the "New Purchases" was a line item for purchasing goods for production. *See, e.g.* H'rg Tr. dated Aug. 22, 2024 at 21:13-14 ("COURT: There is a 5,000 expense for goods, what you call new purchases.").

U.S. 343, 355, 105 S. Ct. 1986 (1985). In circumstances where management is incapable of acting in a fiduciary capacity, section 1104(a) of the Bankruptcy Code provides for appointment of a trustee, stating:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a). Section 1104(a) of the Bankruptcy Code is phrased in the disjunctive, meaning that there are two discrete predicates each of which give rise to the appointment of a chapter 11 trustee; such appointment is authorized upon either a showing of "cause," or demonstration that the appointment is in the interests of the estate. *In re Lowenschuss*, 171 F.3d 673, 685 (9th Cir. 1999).

Although appointment of a trustee has been referred to as an "extraordinary" remedy, courts have nevertheless noted that section 1104 "represents a protection that the Court should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession." *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994) (*quoting V. Savino Oil & Heating*, 99 B.R. at 525 (internal quotations omitted)). Here, cause requires the immediate appointment of a chapter 11 trustee, and such appointment would be in the best interests of creditors.

## A. Cause exists to appoint a Chapter 11 Trustee under section 1104(a)(1) of the Bankruptcy Code.

Section 1104(a)(1) provides that a Court shall appoint a trustee for cause, including "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case." *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) (collecting cases); *see also In re Marvel Entm't Group*, 140 F.3d 463, 472 (3d Cir. 1998) (noting that section 1104(a)(1) provides for a mandatory appointment upon a specific finding of cause). Courts have found "cause" for purposes of section 1104(a)(1) of the Bankruptcy Code in circumstances including, *inter alia*, where a debtor is unable to perform its fiduciary duties as a debtor in possession due to conflicts of interests, based on a debtor's prepetition conduct, and where there has been significant acrimony between a debtor and creditor. *See e.g., Marvel Entm't Group*, 140 F.3d at 473-74 (finding sufficient cause based on "deep-seeded conflict and animosity" between the debtor and the creditors, as well as the lack of confidence in the ability of the debtor to act as a fiduciary); *In re Bellevue Place Assocs.*, 171 B.R. at 623 (finding that a debtor in possession's inability to fulfill fiduciary duties was cause to appoint a chapter 11 trustee); *V. Savino Oil & Heating*, 99 B.R. at 526 (finding that debtor's pre-petition course of conduct "in and of itself, constitute[d] 'cause' for the appointment of a chapter 11 trustee"). "Once the Court has found that cause exists under section 1104(a)(1), there is no discretion; an independent trustee must be appointed." *V. Savino Oil & Heating*, 99 B.R. at 525.

Here, cause exists to appoint a chapter 11 trustee because (i) CEO Read is untrustworthy and incapable of leading the Debtor through the bankruptcy process; (ii) the

Debtor's board and management are irreconcilably conflicted both with respect to its parent and the Subsidiaries, (iii) there is significant acrimony between the Debtor and Arena, its primary secured creditor, and (iv) the Debtor's management's conduct, both prepetition and postpetition, makes clear that it is unable to perform its fiduciary duties in the Cases.

### i. CEO Read is utterly lacking in integrity and incapable of leading the Debtor through this case.

Dishonesty constituting cause under Bankruptcy Code section 1104(a)(1) can come in many forms. Even the perception of a debtor's conduct as dishonest is an independent ground for the appointment of a trustee. *See In re Plaza de Retiro, Inc.*, 417 B.R. 632, 641 (Bankr. D.N.M. 2009). Here, the Debtor is currently helmed by CEO Read who has exhibited a lack of integrity, both prepetition and postpetition. A chapter 11 trustee should be appointed for this reason alone. *In re Briarwood Cap., LLC*, Nos. 10–02677–PB11, 10–02939–PB11, 2010 WL 2884949, at *3-4 (Bankr. S.D. Cal. 2010) (finding cause to appoint a chapter 11 trustee because the debtor's managing member was dishonest).

For example, on August 1, 2024, CEO Read submitted the Read Affirmation, ***under penalty of perjury***, in the state court proceeding stating that Gresham was not in the zone of insolvency on July 17th and 18th—two weeks earlier. *See* Read Affirmation at ¶¶ 87-88. ██████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



Mr. Read was also deceptive in his September 9, 2024 deposition.

1   Early in his deposition, Mr. Read testified that he was, at one point, ████████

2   ███████████████████████████████████████████████████████████████

3   ███████████████████████████████████████████████████████████████

4   ███████████████████████████████████████████████████████████████

5   ███████████████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████████████

8   ███████████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████████

10  ███████████████████████████████████████████████████████████████

11  ████████████████████████████

12  Mr. Read's dishonesty *is continuing even as recently as September 11, 2024* when

13  he submitted the Read Supplement. The Read Supplement is rife with statements that are

14

15  inconsistent with respect to what he testified to on September 9, 2024, the most blatant of

16  which relate to Arena's alternative DIP proposal. In the Read Supplement, Mr. Read states

17  "I found the Arena Term Sheet represented a competitive improvement in several respects

18  upon Ault's then proposed financing, including a reduction of the interest rate from 6% to

19

20  5%." Read Supplement at ¶ 9. On September 9, 2024, Mr. Read testified that the Arena

21  proposal was a ████████████ When pressed on this, Mr. Read testified:

22  ███████████████████████████████████████████████████████

23  ███████████████████████████████████████████████

24

25  ███████████████████████████ When asked about any specific issues

26  Mr. Read had with the Arena term sheet, Mr. Read testified :

27

28  _____

    █████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
██████████████████████████ Aside from the budget and variance testing aspects of the Arena Term Sheet, each of the issues Mr. Read identified as problematic were either the same as, or incremental improvements over, what the Debtor had previously agreed to in connection with the Ault DIP proposal. Due to Mr. Read's dishonesty, a chapter 11 trustee must be appointed.

### ii. The Debtor's board and management are irreconcilably conflicted in this case.

Where, as here, a debtor or a debtor's management or board of directors is saddled with conflicts, a trustee should be appointed. *See In re Embrace Sys. Corp.*, 178 B.R. 112, 128-29 (Bankr. W.D. Mich. 1995) (finding that underlying conflicts and self-dealing constituted cause for the appointment of a trustee); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1228 (3d Cir. 1989) (affirming appointment of trustee based, in part, on debtor's conflict of interest); *In re McCorhill Publ'g Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (holding that conflicting interest in various related entities held by the debtor's directors warranted the appointment of a trustee). Here, for a myriad of reasons, the Debtor and its management are too conflicted to remain in control of this estate.

### a. Ault Alliance, Inc. and Ault Lending LLC are the parties truly in control of the Debtor and this Estate.

As an initial matter, Ault is the party truly in control of the Debtor. Ault Alliance (i) has the right to appoint, and has appointed, four of the seven members of the Debtor's

board of directors (Mssrs. Read, Bentz, Horne and Smith) (*see* GIGA Form 8-K dated September 14, 2022; GIGA Form 10-K dated April 15, 2024), and (ii) three such members also sit on the board of Ault Alliance (Mssrs. Smith, Horne and Bentz) (*see* AULT 10-K dated April 16, 2024). █████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

Because of its control over the Debtor, Ault has been intimately involved in the Debtor's bankruptcy process, both prepetition and postpetition. For example, Ault funded Debtor's counsel's retainer prepetition (*see* Verified Statement at ¶ 4) and since the Debtor first began contemplating the filing of this case, ████████████████████████

████████████████████████████████████████████████████ Ault has taken the leading role in directing the case, ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ Despite the fact that the Debtor was effectively out of cash, could not pay its employees on its next payroll date, had "not yet received any competing proposals for DIP financing," (*see* Read Declaration at ¶88), and had not engaged any other lender regarding a potential financing, the ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Unsurprisingly, there were no true negotiations between the Debtor and Ault on the terms of the DIP financing. The CEO of Ault Lending and a director of the Debtor, Mr. Horne,

In fact, CEO Read testified that he

Mr. Horne has already previewed that, going forward, the Debtor and Ault would continue to operate in the same way:

At the August Board Meeting where the Debtor's board of directors authorized, *inter alia*,



Other examples of Ault exercising utter domination and control individually or through proxies include :

•

---
[29] Debtor's Form 10-K, dated April 15, 2024 at p. 44 ("Messrs. William J. Thompson and Thomas E. Vickers are considered to be independent, and the remaining directors are considered not to be independent. . . .").



On the Petition Date,

After the Petition Date, Mr. Ault directed

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████

This case is not presently being run by the Debtor, or for the benefit of the Debtor's estate. It is being run by, and for, Ault.

     b. The Debtor has already shown it cannot be trusted as a fiduciary of the <u>Estate</u>.

The Debtor has already demonstrated this case is about protecting Ault's interests, not maximizing value for the benefit of creditors. The most obvious example arose ██████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██ This is especially troubling given that Ault has a history of making equity contributions to the Debtor. S*ee* GIGA Form 10-Q dated Sept. 30, 2022 at. 23.[35] Debtor's counsel then (i) listed Ault's debt as undisputed, non-contingent and liquidated on the Debtor's

---

[35] "GWW received funding from BitNile to cover any shortfalls on operating cash requirements. In addition to the allocation of general corporate expenses, GWW received $0.7 million and $5.0 million from BitNile for the nine months ended September 30, 2022 and 2021, respectively, and $0.3 million for the three months ended September 30, 2022 and 2021, which were included in Common Stock."

schedules (*see* Schedule D at 2.2); and (ii) tried to give Ault a *de facto* release under the terms of the DIP original credit agreement (*see* Dkt. No. 16, Ex. B at ¶ 4.14). When asked whether he thought the issuance of this note was appropriate, ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

In light of the evidence that the Debtor and its counsel ███████████

███████████████████████████████████████████, how can the Debtor, its management and its board of directors be trusted to perform a full and fair investigation of other claims that the Debtor may have which would inure to the benefit of the bankruptcy estate, including potential claims against the directors and officers themselves? The answer is they cannot.

      c.  The Debtor may hold significant claims that the directors and officers <u>will not bring.</u>

The Debtor likely has other colorable claims against members of the Debtor's board of directors and Ault, which claims would inure to the benefit of the estate and which the Debtor cannot be trusted to fully and fairly investigate, including:

- Breach of the duties of care and loyalty against the directors and officers present at the August 13 Meeting regarding, *inter alia*, the commencement of the Case, ▉▉▉▉▉▉▉▉
- The avoidance of $4.1 million dollars transfers to insider in the year prior to the Petition Date, relating to "expenses and payroll," without providing clear context or transparency. *See* SOFA at 4.1.[36]
- Avoidance actions against directors and officers for the repayment of certain loan obligations, including, for example, a claim under section 547 of the Bankruptcy Code to avoid the repayment of $50,000 loan from Mr. Horne to the Debtor in October of 2023. Mr. Henckels made a similar loan at the same time, which remains outstanding.
- The propriety of seeking substantive consolidation of the Debtor, the Subsidiaries, and/or other Ault affiliates.
- The validity, amount and proper characterization of purported claims held by Ault, and potential causes of action to recharacterize some or avoid some or all of the debt.[37]
- Lender liability claims against Ault.
- Breach of fiduciary duty claims against Ault in its capacity as controlling shareholder.
- Potential avoidance actions arising from or relating to the 2022 Ault-Gresham merger transaction.[38]

Further, the Debtor may have claims against its directors and officers based upon securities law violations. The law is clear that directors and officers breach their duty of loyalty when they cause or permit the dissemination of information to shareholders through public statements that they know, or are reckless in not knowing, are false or misleading. *See, e.g., Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) (observing that directors breach duties of loyalty and good faith by "knowingly disseminating to the stockholders false information about the financial condition of the company"); *In re InfoUSA, Inc. S'holders*

---

[36] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

[37] *See, e.g., Securities Purchase Agreement* at 2.1 (providing that, as partial consideration for issuance of a $6.75 million note, Ault would cancel and forgive "advances made by [Ault] to the Debtor] in the aggregate amount of $4,067,469" with no substantiation of such amount).

[38] *See, e.g.,* GIGA Form 10-K dated April 15, 2024 at 50 (stating that the Debtor's CFO and a director received, in aggregate, $362,000 in connection with the of 2022).

*Litig.*, 953 A.2d 963, 990 (Del. Ch. 2007) ("[E]ven in the absence of a request for shareholder action, shareholders are entitled to honest communication from directors, given with complete candor and in good faith."). This is because a corporation's management owes a duty of candor in their public statements to shareholders. *See Malone*, 722 A.2d at 10 ("Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty."); *In re Tyson Foods, Inc. Consolidated S'holder Litig.*, 2007 WL 2351071, at *3 (Del. Ch. Aug. 15, 2007) (explaining that when "directors communicate with shareholders, they also must do so with complete candor").

Here, the Debtor may have colorable claims against its officers and directors for preparing, causing, or allowing the Company to issue false and misleading statements. These disclosure failures include:

- <u>Failing to timely disclose the Debtor's default</u>. Gresham first defaulted on the Exchange Notes when it failed to increase its working capital by $250,000 in the quarter ending December 31, 2023. This is not in dispute because the Debtor acknowledged in its SEC filings that "[a]s of December 31, 2023 the Convertible Notes are in default." GIGA Form 10-K dated April 15, 202 at F-20. Under the SEC's rules, the Debtor was required to immediately disclose the default on a Form 8-K, yet it failed to do so. *See* 17 C.F.R. § 240.13a-11 (requiring registrants to file current reports on Form 8-K); Form 8-K, Item 2.04 (requiring disclosure of "triggering event" that increases or accelerates a direct financial obligation with material consequences).

- <u>Incorrectly Stating Maturity Date was Extended</u>. When the Debtor publicly disclosed the default several months later, it falsely stated that the Exchange Notes had been modified in fiscal year 2023 to extend the maturity date to October 11, 2024. *See* GIGA Form 10-K dated April 15, 2024 at F-20 ("The Notes and warrants issued pursuant to the SPA were amended during Fiscal 2023 modified to extend the maturity date to October 11, 2024."). This is not only an incorrect statement, but it was misleading because it could have been interpreted by shareholders as a waiver of the default. This SEC filing was signed by the Debtor's CEO, CFO, and board of directors.

These disclosure lapses expose the Debtor to potential liability under the federal securities laws. *See*, *e.g.,* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5 (making it unlawful to make untrue statements of material facts or make omissions that render statements misleading). This risk of liability includes secondary liability for control persons, such as the Debtor's directors. *See*, *e.g.*, 15 U.S.C. 78t. By causing or allowing these public misstatements, the Debtor may also have claims against management under state law for breaches of fiduciary duty, unjust enrichment, and gross mismanagement (among other potential claims).

The aforementioned claims may be valuable to the estate and would inure to the benefit of creditors. The Debtor has already demonstrated that it cannot act impartially as it relates to Ault, and Mr. Read said



Moreover, the Debtor obtained its director and officer insurance under Ault Alliance's policies. There is no reason to believe

the Debtor would be able to fairly and impartially investigate and pursue causes of action

against of its own directors and officers or Ault. It simply would not.

### iii. The significant acrimony between the Debtor and Arena warrants appointment of a Chapter 11 Trustee.

"Acrimony between debtor and creditor which impedes the reorganization effort is cause to appoint a Chapter 11 trustee." *In re Celeritas Technologies, LLC*, 446 B.R. 514, 519-20 (Bankr. D. Kan. 2011); *see also In re Marvel Entertainment Group, Inc*., 140 F.3d 463, 474 (1998) (finding that acrimony existed and warranted appointment of a trustee under section 1104(a)(1)). Here, the vitriol and conspiracy to damage Arena, its employees and professionals warrants the immediate appointment of a chapter 11 trustee.

First, the Debtor was obstructionist and commercially unreasonable prior to the bankruptcy filing in connection with Arena's attempts to exercise its inspection rights. The Debtor (i) refused to provide materials to Arena until a court ordered it to do so, and (ii) then refused to provide documents to Arena in an electronic format until a court ordered it to do so, despite that being the format in which the documents were maintained. *See* July 15, 2024 State Court Order.

When the Debtor finally allowed an inspection to take place, CEO Read was present and was verbally abusive to Arena personnel, repeatedly calling them, among other things,

██████████████████████████████████████     ██████████████

█████████████████████████████████████████████████████████

████████████████████████████████     Subsequently, Arena exercised its

contractual right to release Mr. Read's resignation letter based upon his erratic and

unjustifiable behavior. *See* GIGA Form 8-K dated Aug. 16, 2024. *See* GIGA Form 8-K dated Aug. 16, 2024.

At an August 13, 2024 meeting of the board of directors, ███████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████

In what may be the ultimate irony, the Debtor now accuses Arena of abusive discovery and 25 hours of "harassing" depositions. Arena would suggest the Court review the transcripts for its own perspective on what occurred at those depositions. Nevertheless, the Debtor simply refuses to acknowledge that ***all of this could have been avoided*** if the Debtor was forthcoming, transparent and substantiated its financial data and projections. Still now the Debtor refuses to provide subsidiary level documents and information.

CEO Read ***admits that the acrimony between the Debtor and Arena has already had a detrimental impact on these cases.*** ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████ Read Decl. at ¶ 88

("Arena has indicated through counsel an interest in providing the DIP financing, but due

to the nature of the parties' adversarial relationship . . . it is unlikely GWW would entertain such financing by Arena.").

Incredibly, Mr. Read and the Debtor do not appear to understand the terms of the Arena DIP proposal, identifying the "reporting requirements" as a "problem" and "onerous." *See* Debtor Reply at p. 7; ████████████████████████████████████ The Arena proposal has the ***same reporting requirements*** as the Ault DIP Facility. Likewise, Mr. Horne ████████████████████████████████████ ██████████████████████████

Moreover, the Debtor's determination to justify the Ault facility as a "higher and better offer" – presumably due to ██████████████████████████████ – blinded management to the potential economics of the Arena proposal.[42] The Debtor points to a 15% budget variance (for a budget subject to amendment), which the Debtor and its counsel refused to engage on, as a deal breaker. First, a budget variance is a common DIP facility term. Second, the concerns implicit with a budget variance do not comport with the Debtor's confident assertions of projection "revenue growth," which is not actually reflected in the budget because the Debtor refuses to provide transparency as to the Subsidiaries. Finally, and most importantly, had the Debtor been willing to facilitate diligence and the underwriting of a loan, and engaged on terms with the senior secured

_____

████ ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████ ████████████████████████████████████████████████████████████
████████████████████████████████████████████ ■ ████████████████

lenders, management would have realized that working collaboratively to create consent and comfort with value and cash flow projections changes the economics of a chapter 11 case. The Arena DIP, though subject to diligence, did not require 18% default interest payments the Debtor allocated in an effort to silence Arena's objection. (Those payments, which Arena did not request, total $276,000.) It is simply bad business on the Debtor's part.

Further, the Debtor has taken positions with respect to the Noteholders' claims which are inexplicable unless based on the Debtor's ill-will towards the Noteholders. Despite listing Ault Lending has having an undisputed, non-contingent, liquidated claim of $15.572 million in its Schedules, ███████████████████████ ███████████████████████ the Debtor listed the Noteholders as having disputed, contingent and unliquidated claims of $2.0 million each despite admitting that the Debtor issued the $2.0 debt instrument underlying such claim almost a year ago. *See* Schedules at 2.1, 2.2; Read Decl. at ¶ 34 ("On October 11, 2023, Debtor issued new Senior Secured Convertible Notes [to] Arena and Walleye . . . in the amount of $2.0 million . . . .). While the Noteholders' claims are in excess of $2.0 million each, there is simply no basis for the Debtor to take the position that this $2.0 is in dispute.

The Debtor has a fiduciary obligation to deal objectively with its creditors. *See* *Celeritas*, 446 B.R. at 519-20. The Debtor is unwilling and unable to do so, and thus the appointment of a trustee is warranted. *Id*.

### iv. The Debtor's conduct makes clear that it is unable to be an effective representative of the bankruptcy estate.

Moreover, cause exists to appoint a chapter 11 trustee when a debtor and its directors and officers make misrepresentations and are less than transparent in fulfilling their duties to a bankruptcy estate. *See, e.g.*, *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526-27 (E.D.N.Y. 1989) (finding the "[d]ebtor's pre-petition conduct, post-petition non-disclosures and misrepresentations, and non-compliance with statutory requirements" constituted 'cause' within the meaning of 1104(a) (1)"); *In re Briarwood Capital, LLC*, Nos. 10–02677–PB11, 10–02939–PB11, 2010 WL 2884949, at *3-4 (Bankr. S.D. Cal. 2010) (finding that dishonesty of a debtor's principal warranted appointment of a chapter 11 trustee). Here, the Debtor and its principals have repeatedly shown that they are willing to make misrepresentations in court, including this Court, and take other steps to deceive when doing so is to their benefit or the benefit of Ault, and thus cannot be trusted to be forthright and transparent during this case.

The Debtor has a penchant for making misrepresentations for the benefit of the Debtor and/or Ault has continued postpetition. In the Read Declaration, Mr. Read stated that as of the Petition Date, he had "not yet received any competing proposals for DIP Financing." Read Decl. at 88. In response to Interrogatory 1, ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ ████████████████████████████████████████████████████████ ████████████████████████



So now, the Debtor's refrain is that prepetition efforts to obtain financing were truncated because Arena noticed a foreclosure sale (*see* Debtor's Reply at p. 1, 2), while acknowledging that Arena agreed to postpone that sale (*see* Read Decl. at ¶ 63).

The Debtor has willfully refused to comply with its discovery obligations.

Now, incredibly, the Debtor's primary "factual" response to Arena's DIP objection is that Arena cannot utilize a valuation expert to opine on value because the Debtor refused to produce current financials, data and documents to Arena as necessary for accepted valuation methodologies. Similarly, the Debtor argues that a DIP is necessary to facilitate operations because Arena provided a DIP term sheet (Debtor's Response at p. 12) – subject to diligence – while ignoring the fact that the Debtor refused to provide fulsome diligence. And, it continues to compare Arena's request for diligence to the lack of requests by an insider who is willing to advance funds on a budget alone. An effective representative of the estate understands the chapter 11 process is premised on information parity.[44]

The Debtor has misrepresented budgetary issues to the Court in connection with the "New Purchases" line item in its initial budget. *See, e.g.* H'rg Tr. dated Aug. 22, 2024 at 21:13-14 ("COURT: There is a 5,000 expense for goods, what you call new purchases.").

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[44] The Debtor's approach to the proper assessment of financial information is, at best, dishonest. The Debtor criticizes Arena for focusing on risk factors that may impact future performance. Debtor's Reply at pp. 4-5. ████████████████████████████████████████████ ███████████████████████████████████████ Yet – past performance reflects net operating losses in excess of $8.3 million in 2023, and $6.5 million in 2022, and aggregate net operating losses since Jan. 1, 2018 of approximately $21.5 million. *See* GIGA Form 10-K dated April 15, 2024 at F-27. Presumably used to hearing that criticism, the Debtor takes the position that the Court should ignore that past performance because "technology and manufacturing companies customarily lose money in the earliest years of their existence because of the large investments in research and development that must be made before they can establish a stable customer base and begin operating profitably." Debtor's Reply at p 5. The applicability of that adage is questionable because "Gresham was incorporated in California on March 5, 1980." GIGA Form 10-K dated April 15, 2024 at p. 3.



Moreover, there are fundamental issues with the way that the Debtor maintains its accounting. Despite 10-K disclosures that Ault maintained books and records, the Debtor now asserts ███████████████████████████████. The fundamental issue with the Debtor's recordkeeping is best exemplified by their CFO's

Further, in late June of 2024, while the Debtor was insolvent, ███████████

*See generally* Schedules.

████████████████████████████████████

███████████

**B. Appointment of a Chapter 11 Trustee under section 1104(a)(2) of the Bankruptcy Code is in the best interests of creditors.**

Even if the above described conduct and conflicts of interest did not constitute "cause" under section 1104(a)(1), a trustee should nevertheless be appointed under section 1104(a)(2) of the Bankruptcy Code because independent representation of the Debtor's estate is in the best interests of the Debtor's creditors. Courts have found that section 1104(a)(2) entails the exercise of a spectrum of discretionary powers and equitable considerations, including a cost-benefit analysis, to determine whether the appointment of a trustee would be in the interests of creditors, equity security holders and other interests of the estate. *See, e.g.*, *In re Sharon Steel Corp.*, 86 B.R. 455, 458 (Bankr. W.D. Pa. 1988), *aff'd*, 871 F.2d 1217, 1226 (3d Cir. 1989). In determining the best interests of creditors and the estate, courts "resort to [their] broad equity powers ... equitable remedies are a special blend of what is necessary, what is fair and what is workable." *In re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980). Stated differently, section 1104(a)(2) creates a flexible standard and allows the appointment of a trustee even when no "cause" exists. *Sharon Steel Corp.*, 871 F.2d at 1226; *Marvel Entm't Group*, 140 F.3d at 474.

Courts have found appointment of a trustee to be in the best interests of creditors under circumstances similar to those present in this case, including when:

- A debtor failed to disclose material financial information and was not candid and accurate about its profitability. *See In re Celeritas Technologies, LLC*, 446 B.R. 514, 52-21 (Bankr. D. Kan. 2011). As discussed, the Debtor has been less than candid thus far in these proceedings.

- The debtor had an acrimonious relationship with its creditors. *See In re Eljamal*, Case No. 17-CV-7870, 2018 WL 4735719, at *8 (S.D.N.Y. Sept. 28, 2018). The Debtor has already shown it cannot be impartial.

- When the debtor had significant conflicts of interest creating the presumption that the debtor could not be impartial. *In re L. S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D. W.Va. 1980). The Debtor is beholden to its parent and largest purported secured debtholder, and has previously attempted to preclude the investigation of potential claims against it.

Other courts consider certain factors in determining whether appointment of a chapter 11 trustee is warranted under section 1104(a)(2), including:

(i)   the trustworthiness of the debtor;

(ii)  the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation;

(iii) the confidence – or lack thereof – of the business community and of creditors in present management; and

(iv)  the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.

*In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990). Here, the *Ionosphere* factors each weigh in favor of appointing a chapter 11 trustee:

- First, the Debtor is not trustworthy. As discussed, the Debtor, and its directors and officers have a casual relationship with the truth, and cannot be depended on to be forthright with the Court or the estate's creditors. *See* Read Affirmation; ███████████████████████ DIP Motion at Ex. A (Budget), "New Purchases"; █████████████████

- Second, the Debtor's past financial performance has been poor, as recognized by the Debtor's board at the August Board Meeting. *See* ███ ███████ *see also* GIGA 10-K dated April 15, 2024 at 15 ("We believe that there is doubt about our ability to continue as a going concern because we have incurred recurring net losses and we have not been able to procure funding for our negative cashflows.). Further, the Debtor has not proffered a path forward. It has no income, needs a significant cash infusion yet has not indicated how it expects to exit bankruptcy or repay any borrowings.

- Third, the business community and estate's creditors seem to have lost confidence in the Debtor and its management. Despite an asserted valuation of either $32 or $60 million, the Debtor has been unable to obtain working capital. *See* GIGA 10-K dated April 15, 2024 at 15. The Debtor's service providers, including the professional hired to assist the Debtor in obtaining working capital, have not been paid and have cut back services. *Id.* The Noteholders, the Debtor's senior secured creditors, have no faith in the Debtor's management to be candid or impartial, or to find a way to make this chapter 11 proceeding successful.

- Fourth, the benefits of appointment of a trustee outweigh the costs. Simply put, the Debtor cannot be trusted to control this estate—it is too beholden to Ault and too conflicted to act in the best interests of creditors.

Accordingly, appointment of a chapter 11 trustee would be in the best interests of creditors.

## <u>RESERVATION OF RIGHTS</u>

Expedited discovery to the Debtor is ongoing. Accordingly, Arena fully reserves all of its rights to amend or supplement this Motion.

*[remainder of the page intentionally left blank]*

1

## CONCLUSION

2      **WHEREFORE**, Arena respectfully requests that the Court enter an order

3 substantially in the form attached as **Exhibit D** appointing, pursuant to section 1104(a) of

4

the Bankruptcy Code, a chapter 11 trustee to manage the Debtor's business and affairs.

5

6      DATED this 12th day of September, 2024.

7                     QUARLES & BRADY LLP
                     Renaissance One

8                     Two North Central Avenue
                    Phoenix, AZ 85004-2391

9

10

11                By */s/ Anthony F. Pirraglia*
                  Robert Harris

12                   Jason D. Curry
                  Anthony F. Pusateri

13              -and-

14                John. J. Monaghan
               HOLLAND & KNIGHT LLP

15                10 St. James Avenue, 11th Floor
               Boston, MA 02116

16

17                Anthony F. Pirraglia
               HOLLAND & KNIGHT LLP

18                787 Seventh Avenue, 31st Floor
               New York, NY 10019

19

20                *Attorneys for Arena Investors, LP, as Collateral Agent and Administrative Agent for Arena Investors, LP and Walleye Opportunities*

21                *Master Fund Ltd.*

22

23 COPIES of the foregoing sent via
e-mail this 12th day of September, 2024, to:

24

25 Patrick A. Clisham
ENGELMAN BERGER PC

26 2800 N. Central Avenue, Suite 1200
Phoenix, AZ 85004

27 Email: pac@eblawyers.com
Attorneys for Debtor

28

1  Christopher C. Simpson
   Warren J. Stapleton
2  Andrew B. Haynes
   OSBORN MALEDON PA
3  2929 N. Central Avenue, 20th Floor
   Phoenix AZ 85012
4  Email: csimpson@omlaw.com
   Email: wstapleton@omlaw.com
5  Email: ahaynes@omlaw.com
   Attorneys for Ault Lending, LLC
6
   Larry L. Watson
7  OFFICE OF THE U.S. TRUSTEE
   230 N. First Avenue, Suite 204
8  Phoenix, AZ 85003
   Email: larry.watson@usdoj.gov
9
   Anthony P. Cali
10 STINSON LLP
   1850 N. Central Avenue, Suite 2100
11 Phoenix, AZ 85004
   Email: anthony.cali@stinson.com
12 Attorneys for Official Committee of
   Unsecured Creditors
13
14 /s/ Sybil Taylor Aytch

15

16

17

18

19

20

21

22

23

24

25

26

27

28